IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES DEMERS,

                    Plaintiff,                          OPINION AND ORDER

        v.                                              18-cv-030-wmc

COUNTY OF BARRON,

                    Defendant.

After plaintiff James Demers questioned defendant Barron County's practice of not paying jail staff for time spent in a briefing before the start of their shift, he alleges that the County retaliated by initially demoting him and later constructively discharging him in violation of the Fair Labor and Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3). Following discovery, the County filed a motion for summary judgment (dkt. #19), which the court will deny in part because plaintiff has put forth sufficient evidence from which a reasonable jury could conclude that he was demoted because of conduct protected by the FLSA. However, the court will grant defendant's motion to dismiss his constructive discharge claim because plaintiff cannot meet the demanding, objective standard established by the Seventh Circuit based on the limited evidence he has produced.

UNDISPUTED FACTS[1]

**A. Background**

James Demers began his employment with the County as a part-time correctional

---

[1] The court finds the following facts undisputed and material, unless otherwise noted.

officer for the Sheriff's Department in 2002. A year later, Demers became a full-time employee.

In July 2010, Sheriff Chris Fitzgerald temporarily appointed Demers Jail Sergeant, then he formally appointed him to that position in December 2010. Jail Sergeants report to the Jail Captain (or Administrator), who in turn reports to the Chief Deputy, who ultimately reports to the Sheriff. Jail Sergeants supervise correctional officers.

Fitzgerald has been the sheriff of Barron County since August 2008; Chief Deputy Jason Leu has served in that capacity since 2003; and the current Jail Captain, Tim Evenson, has served as such since October 2013. Before Evenson, Ron Baures was Jail Captain from May 2012 to October 2013, with Mark Evans serving in the same role before that.

As Sheriff, Fitzgerald was responsible for ensuring that policies, procedures and rules of the Sheriff's Department were carried out. As Jail Captain, Evenson was responsible for the overall management of the jail, its staff and operations, including ensuring that shift changeover was completed according to the policy.

## B. Demers' Performance History as Jail Sergeant

### 1. Incidents in 2012 and 2013

In 2012, then Jail Captain Baures had a series of discussions with Sergeant Demers about his performance. On August 1, 2012, Captain Baures spoke with Demers about his improper use of sick time. Specifically, Demers was called out for using sick time to shop at Menards, a home improvement store. Defendant characterizes this event as a "verbal reprimand," although Baures' contemporaneous note from that day describe it as "verbal

reminder." (Hanson Decl., Ex. 4 (dkt. #33-4) 1.) During this same time period, Baures also testified at his deposition that he believed Demers was not happy with Baures, did not agree with Baures' decisions and was undermining him. In a note dated December 28, 2012, Captain Baures also purported to summarize a contemporaneous meeting that Sheriff Fitzgerald, Chief Deputy Leu and he had with Demers concerning emails between Demers and other staff members that Baures described as "unprofessional." (Hanson Decl., Ex. 5 (dkt. #33-5).) The note includes three emails sent by Demers in late December 2012. According to Baures' note, Sheriff Fitzgerald and Deputy Leu informed Demers "that the emails sounded too harsh and basically could have been re-worded to sound more professional." (*Id.* at 2.) While Baures noted that Demers seemed "receptive and [was] anticipated to comply with our recommendations," Baures also noted that Demers was specifically warned "if such actions continue, he could possible be demoted or other actions taken." (*Id.*) Even so, no disciplinary action was taken at that time either.[2] At his deposition, Baures even testified that he believed the issue was addressed and resolved. (Baures Dep. (dkt. #24) 9-10.) Accordingly, Baures did not view his note as a written or verbal warning. (*Id.*)

On June 1, 2013, however, Demers did receive a Letter of Discipline from Sheriff Fitzgerald concerning a telephone call he allegedly made to a citizen that was harassing

---

[2] Plaintiff submits proposed findings of fact as to policies of Barron County, and the Sheriff Department specifically, concerning progressive discipline. (Pl.'s Add'l PFOFs (dkt. #41) ¶¶ 14-18.) From the court's review, the only arguably material facts is that a verbal warning is the least severe method of formal discipline, while "counseling" of an employee is *not* discipline. Since none of the 2012 incidents refer to an actual warning or reprimand, the court must treat them as counseling sessions, at least for purposes of summary judgment when facts must be viewed in the light of the plaintiff as the non-moving party.

and threatening.  (Hanson Decl., Ex. 6 (dkt. #33-6).)  As context, the citizen was Demers' former brother-in-law, who Fitzgerald acknowledged "wasn't the most outstanding citizen of Barron County."  (Pl.'s Add'l PFOFs (dkt. #40) ¶ 222.)  Still, Demers acknowledged making the phone call and believed the discipline was appropriate.

### 2.  2014 and 2015 Performance Evaluations

Having replaced Baures as Jail Captain in October of 2013, Evenson completed and signed Demers' performance evaluation on March 27, 2014.  The evaluation had two options for rating -- meets expectations and needs improvement.  In each of the performance objective categories -- customer service, safe working environment, good judgment, works well with others and care of equipment -- Evenson gave Demers a rating of "meets expectations" and also gave an overall performance rating of "meetings expectations."  (Hanson Decl., Ex. 30 (dkt. #33-30).)

On May 29, 2015, Jail Captain Evenson also completed Demers' annual performance evaluation.  For this review, there were four possible ratings:  exceeds expectations, achieved expectations, developing performance and did not achieve performance.  The number of performance objective categories for this evaluation was expanded to nine.  For each of these, Evenson rated him as achieved expectations, specifically commenting under the category "interpersonal skills / teamwork / commitment" that Demers "works well with staff, promotes teamwork."  (*Id.*, Ex. 28 (dkt. #33-28).)  For other categories, Evenson provided similar positive comments, such as "[a]lways willing to try new things," "communicates well," and "[v]alued member of the department."  (*Id.*)

### 3. Incidents in 2016

However, employment matters worsened substantially for Demers during 2016. On February 29, 2016, Jail Captain Evenson and Deputy Chief Leu met with Sergeant Demers to discuss a "negative atmosphere" on his shift. (Def.'s PFOFs (dkt. #21) ¶ 36.) Demers does not dispute that this meeting took place, but disputes that there was actually a "negative atmosphere" during his shift. If true, Demers nonetheless acknowledged that he would take the blame for that. During the February 29 meeting, Captain Evenson instructed Demers to communicate with him more, or at minimum Demers understood following this meeting that if there were issues going on in the jail, he should communicate with Evenson about those issues. Again, however, documentation of this meeting is not labeled as a verbal or written warning. (Hanson Decl., Ex. 7 (dkt. #33-7).)

### a. Body Cameras

On March 9, 2016, Jail Captain Evenson and Chief Deputy Leu also met with Sergeant Demers, along with corrections officers Tammy Luther and Chad Smith, about their failure to wear body cameras. In January 2016, Sheriff Fitzgerald had issued a directive that body cameras were to be worn by all Department personnel while on duty, including jail officers and sergeants, whose cameras were to be turned on whenever they had contact with an inmate. While Demers testified at his deposition that he understood this directive, a report revealed that two jail officers on his shift, Luther and Smith, had not activated their body cameras during multiple shifts. In addition, Demers had not been wearing his body camera, at least on March 10. As he testified at his deposition, he forgot to put it on.

The Sheriff's Department has a Policy and Procedures Manual, sections of which are relevant to the parties' dispute. With respect to the body camera requirement, Policy 200-1-3 Insubordination requires employees to follow orders of their commanding officers. Specifically, the policy provides that "[f]ailure to follow orders and show proper respect for the authority and rank of commanding officers constitutes insubordination and will not be tolerated." (Def.'s PFOFs (dkt. #21) ¶ 18 (quoting Hanson Decl., Ex. 2 (dkt. #33-2) 3).) Insubordination is defined as "[d]isobedience of a lawful order or directive, whether written or oral." (Pl.'s Resp. to Def.'s PFOFs (dkt. #41) ¶ 18 (citing Hanson Decl., Ex. 2 (dkt. #33-2) 3).) The policies and procedures also provide that "[t]he maintenance of the department's command structure is every employee's responsibility regardless of rank or position." (*Id.* at ¶ 19 (quoting Hanson Decl., Ex. 2 (dkt. #33-2) 3).)

On March 10, 2016, Demers was issued a Written Reprimand, stating that he was being reprimanded for failing to follow the body camera policy and for insubordination. (Hanson Decl., Ex. 8 (dkt. #33-8).) The last sentence of the document stated, "I am also informing you that any further incidents of this nature will result in more serious sanctions, which may include demotion or termination." (*Id.*) The Written Reprimand was signed by Captain Evenson and Sergeant Demers. While Demers does not dispute any of this, he points out that the same report prompting the meeting on March 9 indicated that two other officers on his shift *were* using their body cameras as directed. At the time of this written reprimand, Demers further points out that Deputy Chief Leu did not have any discussions with Evenson about demoting Demers.

### b. Shift Turnover

The Policy and Procedure Manual also contains a "Correction Officer Post Orders" section, identified as Policy C-900. The policy defines "Shift Turnover" as "the off-going officer informs the on-coming officer of pertinent information regarding the previous shift or any areas of concern or problems relevant to the management of the housing unit, post assigned, or facility as a while. (Hanson Decl., Ex. 11 (dkt. #33-11) 1.) "Shift Briefing" is defined as "gathering of an on-coming shift and a shift supervisor for the relay of pertinent information, special assignments or activities that need to be performed on an upcoming shift." (*Id.*) A subsection sets forth the policy for staffing post positions, and provides in pertinent part, "[a]ll personnel shall arrive at a shift briefing and be ready to be assigned a post position at the start of their assigned shift." (*Id.* at 3)

During the time relevant to plaintiff's claims, the schedule for shifts was three days on; two days off; two days on; and three days off. For example, a jail sergeant or officer would work Friday, Saturday and Sunday, have Monday and Tuesday off, then work Wednesday and Thursday, and have Friday, Saturday and Sunday off. Shifts for jail sergeants were 12 hours in length from 6:00 a.m. to 6:00 p.m. for the day shift or from 6:00 p.m. to 6:00 a.m. for the night shift. Jail officers also worked 12 hours, but their shifts started and ended at 6:30, rather than 6:00.

Prior to April 2016, the practice was for jail officers to come in early to receive their shift passdown. That practice, however, was not in accordance with written policy, or at least not with the written policy set forth above, which did not state that jail officers should come in before their shift time for shift passdown. Moreover, the length of time conducting

passdown varied depending on issues that needed to be communicated.

On March 9, 2016, the same day that he met with Captain Evenson and Deputy Chief Leu to discuss staff members' failure to wear body cameras, Demers sent the following email to County Administrator Jeff French:

> I have been working here for 14 years. I have asked this question in the past with no real answer. As jail staff, we are required to be here 15 minutes before our shifts so we can get the passdown from the shift that is on duty. We don't get paid for this 15 minutes that we are required to be here. Why don't we get paid for this time?

(Hanson Decl., Ex. 9 (dkt. #33-9).)[3] French responded to Demers' email that he did not know the answer, but copied Jail Captain Evenson and Human Resources Director Rachel Richie on his response to see if they could respond.

On March 11, 2016, Captain Evenson responded to the email, stating that he knew "some staff . . . show up early but this is not a requirement I have made." (Hanson Decl., Ex. 15 (dkt. #33-15) 3.) However, he also acknowledged that "when the control officer is being relieved in central control, information does need to get passed to the next officer coming in," and "[t]his probably does take a few minutes to do so, conceivably someone might be here for a few minutes extra to accomplish this." (*Id.*) Nevertheless, Evenson

---

[3] At his deposition, Demers acknowledged his email to County Administrator French did not follow the Sheriff's Department chain of command, but explained that he was "just asking a question." (Def.'s PFOFs (dkt. #21) ¶ 58 (quoting Demers Dep. (dkt. #25) 53).) At his deposition, Demers also explained that on March 4, 2016, he had received an email from a correctional officer, Hilda Just, forwarding a news story about a company (Hormel) being sued for not paying their employees for about five to seven minutes of transition time before being on the line. Demers testified it was this email that had prompted him to look at the policy on shift start time and also prompted his email to French. (Demers Dep. (dkt. #25) 54.) Demers also recalled asking Mark Evans, the Jail Captain in 2012, and Sue Avery, his Sergeant in 2010, this same question, but did not receive any response from either. (*Id.* at 53.)

concluded by stating, "[t]here is no standing order to come in early for 15 minutes but th[ere] is an expectation that information will be passed from one shift to the next for the safety and security of staff and the facility." (*Id.*)

Around this same time, County Administrator French and HR Director Richie met to discuss whether they needed to determine what the actual passdown procedure was. Richie then conducted her own investigation by talking to Chief Deputy Leu and Jail Captain Evenson. They reported to her that correctional officers were coming in early, but would also leave early, so it was a wash. Nonetheless, Richie reported to French that she believed there was a problem with how the Sheriff's Department personnel were being paid -- or, more accurately, not being paid -- for this "passdown time." In contrast, Leu continued to believe that there was not a problem.

On March 20, Demers responded to Captain Evenson's email, acknowledging what he was saying, but stating, "[i]f you ask most staff, they will tell you [that] we have been told to be here 15 minutes before our shifts for passdown." (*Id.* at 2.) He further acknowledged that *Captain Evenson* may not have told staff this, but reported that others did. After reviewing the Policy and Procedures Manual again, Demers went on to observe that: "[W]e have been doing shift change wrong. If we do it the way it states in the Policy and Procedure Manual[,] we won't have a problem anymore." (*Id.*) Demers acknowledged that this would mean the sergeants will not overlap for passdown; rather, he suggested the incoming sergeant would use the first 30 minutes of his or her shift (beginning at either 6:00 or 18:00) to "read all the necessary log from the shift/shifts previous." (*Id.*) When the correctional officers arrive at 6:30 or 18:30, the sergeant could then brief the incoming

officers, rather than having the outgoing officers do it.  Demers ended this email with the following, "I'm just saying that the way it is done now we are not getting paid for the 15 minutes we all arrive early for work.  I would like you to look at this and I would like this change to start right away.  This does make sense [with] how it is set up in our Policy and Procedure Manual."  (*Id.*)

Jail Captain Evenson acknowledged that he read Demers' March 20 email and understood that Demers wanted to change things -- specifically, he understood that Demers wanted to eliminate the 15 minutes staff was coming in early -- but Evenson also testified at his deposition that he did not *completely* understand Demers' email.  While there is a dispute at to whether Evenson and Demers discussed the content of his email *before* a March 14, 2016, meeting, there appears to be no disputed that Evenson and Demers discussed the March 10 email he had sent to French at the March 14 meeting.  Captain Evenson reiterated to Demers that he didn't require people to come in early, but if they chose to, he did not object.  Evenson felt that meeting constituted "counseling for his going outside the chain of command, because Demers should have raised the compensation question for passdown time with him directly, but he did not consider it "discipline."

On March 22, 2016, Captain Evenson formally responded to Demers' March 10 email, copying all jail sergeants.[4]

> I can only expect everyone to follow what is in the policy.  The policy is that sergeants/OIC will be here from 0600 to 1800 and the officers will be here for 0630 to 1830. . . . It is the sergeant's responsibility to read all the necessary logs and update the staff coming in at 0630 or 1830.  It is the staffs'

---

[4] The "jailsergeants@co.barron.wi.us" email address also goes to Chief Deputy Leu and Sheriff Fitzgerald.

> responsibility to be in their assigned post by the start of their
> shift and to be there until their shift ends.

(*Id.*)[5]  Evenson also noted, "As you pointed out[,] there is policy in place to account for shift pass-down without the overlap in shifts and this is what the staff is expected to follow. I know that many people show up early on their own and this makes pass-down easier and more personably one-to-one.  This is appreciated but not required because we do not pay for that extra time."  (*Id.*)

Evenson represents that at the time he wrote this email, the written passdown policy was obviously not being followed, but also testified that the policy was unclear and ambiguous.  He viewed his email as an "interpretation" of the policy.  Demers testified that he understood Captain Evenson's email to be an order, but that it was impossible to conduct a staff briefing and have the staff at their assigned post at the start of their 6:30 (or 18:30) shift.  (Demers Dep. (dkt. #25) 77, 81-82.)[6]

On his part, Sheriff Fitzgerald represents that he first became aware of this compensation issue after being copied in on Evenson's March 22 email.  Fitzgerald understood that the issue was whether staff should be paid for the 15 minutes they were coming in early for passdown.  He then spoke with HR Director Richie, who told him that she was looking into the issue.

On March 29, Demers forwarded on his earlier email chain to the other three jail

---

[5] A "post" refers to a certain section of the jail.  The jail has five posts:  central control post, booking post, security post, Huber post and utility post.

[6] From the court's review of Evenson's March 22 email, it does not contain any direction as to how to accomplish the staff briefing or passdown, but the court will address this further below in the opinion.

sergeants (without copying in Evenson or others then involved), informing them in a cover email that he was going to "change how I do passdown and the time my staff is to be here for work." (*Id.* at 1.) Demers continued that he was making this change to "conform to our Policy and Procedures on what time to show up for work and the passdown." (*Id.*) He also advised that: he would arrive at 5:55 a.m., put his equipment on, and report for duty at 6:00 a.m.; he would not receive a passdown from the on-duty sergeant or a corrections officer; and instead, he would review "all the logs and big board for passdown for my crew." (*Id.* at 2.) He further advised that he would plan for his staff to be in central control by 6:30 a.m., ready for duty, at which point he would "do a passdown to my crew on all the important information," without receiving a "passdown from the staff they are relieving." (*Id.*) Finally, Demers explained, "[t]his will eliminate any jail staff from the overlap of up to 15 minutes [for which] we are not getting paid," and he reiterated that this was consistent with the official policy. (*Id.*)

Defendant maintains that Demers "did not have any communication with Captain Evenson before sending this email on March 29, 2016," but the court presumes that defendant means that Demers did not have any contact after Evenson's March 22 email, since he had obviously met with Demers on the issue before that email. Moreover, Demers' email to his fellow jail sergeants on March 29 appear to be generally consistent with his March 20 email to Evenson, if not with Evenson's artful attempt to sidestep the issue in his own March 22 email.

Specifically, Demers' March 29 email stated that his staff would report to central control at 6:30 a.m., whereas Evenson's March 22 email ordered jail staff to be at their

assigned posts at the start of their shifts. Captain Evenson testified that he anticipated any "staff briefing" not done voluntarily before shift would occur at a meeting between a supervisor and an individual officer at the officer's assigned post. Demers acknowledged at his deposition that his plan deviated from that ordered by Evenson on March 20, but further explained that under the policy, he was required to gather his staff somewhere in the jail in order to do staff briefing. There is *no* dispute that under Demers' plan, with the outgoing staff leaving at 6:30, posts throughout the jail would be vacant for approximately ten minutes between shifts. However, Demers points to other sergeants' practices of gathering their staff for similar meetings, or even to eat together for up to 30 minutes, thereby also leaving their posts unmanned, which the County does not dispute. (Pl.'s Add'l PFOFs (dkt. #40) ¶¶ 22-24.)

On March 30, 2016, Jail Sergeant Hoff -- one of the recipients of Demers' March 29 email -- forwarded it to Captain Evenson. On March 31, Jail Sergeant Kelly Devine also sent an email to Evenson regarding Demers' proposed change in passdown procedure. Sergeant Devine was upset that Demers was bringing up the issue of pay for passdown time. Devine further testified that she did not care what the law required; rather, she was okay with people not being paid even if it was required by law. On April 1, as Devine was coming off her shift and Demers was coming on his, she refused to provide Demers information about the shift consistent with his plan, since he was to receive that information from jail logs, not from the outgoing staff.

On April 3, Sergeant Demers sent a follow-up email to the other three Jail Sergeants, which reiterated his concern that the County could be liable for not paying for the 15-

minute passdown period.  (Hanson Decl., Ex. 16 (dkt. #33-16).)  In this email, Demers advocated for following policy, which meant not requiring or creating pressure for staff to arrive 15 minutes before the start of their shift, and he stated, "[w]ith the email that was circulated with this topic[,] Tim [Evenson] also said he expects the officers to follow Policy and Procedures which if you read between the lines says the same thing."  (*Id.*)

Around this same time, Captain Evenson contacted Mark Koenecke in IT and asked for access to Demers' email over the past few weeks to determine whether there were other e-mails on which he had not been copied.  Evenson received access and reviewed those emails, but does not remember if he reviewed Demers' April 3rd email.

### 4.  Demotion Decision

At some point, Captain Evenson recommended that Sheriff Fitzgerald demote Demers, and he apparently accepted that recommendation.  On April 5, 2016, Evenson spoke with HR Director Richie about Sheriff Fitzgerald's decision to demote Demers from Jail Sergeant to Jail Officer.  Richie recalled that Evenson told her that Demers had exhibited a negative attitude and had communication issues since 2012.  After her telephone call with Evenson, Richie reportedly reviewed Demers' performance evaluations from 2014 and 2015.  While she could not recall the specifics of those evaluations during her deposition, Richie testified she subsequently told Evenson that Demers' reviews were consistent with his description.  While the Sheriff's Department had in her view sound reasons for demoting Demers, Richie indicated that she inquired during that same conversation with Evenson whether the demotion had anything to do with Demers' earlier email to County Administrator Jeff French asking about jail staff being paid for time spent

engaging in passdown.  Evenson assured Richie that the demotion decision was unrelated to that inquiry.

Later that day, Captain Evenson drafted a document dated April 5, 2016, recommending that Demers be demoted to a correctional officer, which he then shared with Sheriff Fitzgerald, Chief Deputy Leu and HR Director Richie.  In the document, Evenson describes Demers' March 29 email as "condescending and unprofessional," asserting that he should have run it by Evenson before sending it out.  (Hanson Decl., Ex. 17 (dkt. #33-17).)  Evenson also stated that, "[a]fter reading the email[,] he is apparently overstepping his authority by interpreting policy and law and giving his fellow sergeants directives all without my permission or informing me or consulting with me."  (*Id.* at 2.)  Evenson then recounted Demers' disciplinary history (as detailed above).  With reference to the body camera incident in particular, Evenson referenced "receiv[ing] information that Demers had *directed* his staff not to wear the required body cameras as directed in policy."  (*Id.* at 3 (emphasis added).)  At his deposition, however, Evenson acknowledged that he was only told some of Demers' staff were not using the body cams, *not* that Demers had instructed or directed them not to use the body cameras.  (Pl.'s Add'l Facts (dkt. #40) ¶ 135 (citing Evenson Dep. (dkt. #27) 62-63).)  Nevertheless, Evenson also apparently told Chief Deputy Leu and Sheriff Fitzgerald that Demers had instructed his staff not to wear the body cameras.

After reviewing the document, Richie believed that the reasons for demotion were legitimate and not related to Demers' email to French, though as plaintiff points out she did not conduct an independent investigation.  In his declaration submitted in support of

15

the County's motion for summary judgment, Sheriff Fitzgerald avers that he "made the decision to demote James Demers from Jail Sergeant to Jail Officer because I did not trust that he could follow or carry out orders of his superiors and continued to exclude the Jail Captain from communications concerning jail operations and issues." (Fitzgerald Decl. (dkt. #22) ¶ 17.) Fitzgerald also stated that he "was of the opinion that the issues related to Mr. Demers' performance were ongoing, despite being given an opportunity to improve, and were detrimental to jail operations." (*Id.* ¶ 18.)

Plaintiff contends that these explanations conflict with Fitzgerald's deposition testimony, but stops short of requesting that the court strike Fitzgerald's declaration or at least portions of it. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("[P]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). Regardless, at his deposition, Fitzgerald testified that he demoted Demers because of "an accumulation of a lot of different things," including the March body cameras issue (Fitzgerald Dep. (dkt. #28) 17), and later testified that it was because of "past performance" (*id.* at 33). While Fitzgerald did not mention concerns about communications at his deposition, nor specifically excluding Captain Evenson on communications, his general statement that it was "an accumulation of a lot of different things" could cover this more specific concern.[7]

---

[7] Plaintiff also points to French's deposition testimony that Demers was demoted because he was not following the body cameras' policy to dispute Fitzgerald's reason for demoting Demers offered in his declaration. (Pl.'s Resp. to Def.'s PFOFs (dkt. #41) ¶ 92 (citing French Dep. (dkt. #29) 20-21).)

## C. Demers' Demotion

On April 11, 2016, Sergeant Demers was informed that he would be demoted to jail officer during his annual performance evaluation with Captain Evenson and Chief Deputy Leu. (Defendant notes that this date was in line with performance evaluations of others in 2016.) Demers avers that he specifically asked Evenson and Leu if he was being demoted because he questioned Sheriff's Department Policy and Procedures, and both answered, "yes." Defendant does not dispute that Demers testified as such, but disputes that he asked this question, that either Evenson or Leu provided that response and that this was the reason for the termination.

At the end of the meeting, defendant represents Demers "was given the opportunity to go home and think about the demotion and to return for a meeting with Sheriff Fitzgerald, Chief Deputy Leu, Captain Evenson and Rachel Richie [scheduled] the following day." (Def.'s PFOFs (dkt. #21) ¶ 99.) Demers even testified at his deposition that he asked Evenson what he should think about while home, and Evenson responded, "if this is the right place for you to work." (Pl.'s Resp. to Def.'s PFOFs (dkt. #41) ¶ 99 (quoting Demers Dep (dkt. #25) 113-14).)

On April 12, 2016, Demers did meet with Fitzgerald, Richie, Evenson and Leu. During that meeting, he was (1) formally demoted, (2) informed that he would be given a "last chance" agreement, once he returned a body camera that he had mistakenly taken home with him, and (3) his pay would be reduced consistent with the demotion. During the meeting, Demers avers that Leu asked him what he was "going to do to change [his] behavior to be successful at the jail," and Evenson said, "he did not want issues with

[Demers] like he has had" in the past. (Demers Decl. (dkt. #42) ¶ 4.) In response to both Leu and Evenson, Demers purportedly responded, "I would do my job and follow policies and procedures." (*Id.*)

At that point, Demers represents that Fitzgerald became angry, "raised his voice and replied, each time, that my answer was unacceptable." (*Id.* ¶ 5.) Demers states that Fitzgerald also told him that "I always did things my way and that I wasn't a team player," that he was "not o.k. with bringing me back and working with other people with my attitude," and that "he couldn't have people 'bucking the system.'" (*Id.*) Demers finally avers that "[e]ventually Sheriff Fitzgerald banged his fist on the table, crossed his arms and turned away from me." (*Id.*) In his declaration, however, Fitzgerald represents that he had "no personal issues with Mr. Demers and believed he would better the serve the Department as a jail officer than as a jail sergeant given his knowledge of jail operations," and that he "fully anticipated that Mr. Demers' employment with the Department would continue without issue following his demotion to jail officers." (Fitzgerald Decl. (dkt. #22) ¶¶ 19-20.)

Ultimately, Demers does not claim anyone at any point during the April 12 meeting indicated that he would not be able to continue his employment as a jail officer. Indeed, on April 15, Demers was provided a letter of demotion and the promised last change agreement via email. That letter indicated his hourly rate of pay would be $23.90, a decrease from the $25.75 he earned as a Jail Sergeant. The last chance agreement stated that Demers had received a written warning on March 29, 2016, for "directing his crew to go against departmental policy and not wear cameras" and described that he had received

"verbal warnings" on August 1, 2012, January 13, 2016, and February 29, 2016. (Hanson Decl., Ex. 20 (dkt. #33-20) 2.)

After receiving the email, Demers inquired of Captain Evenson whether he would be terminated if he did not sign the agreement, to which Evenson responded that he would not be terminated. Demers did not sign the agreement. Although on April 18, 2016, Demers requested and received FMLA for treatment of depression through May 17, 2016.

### D. Resignation

On May 18, 2016, Demers, through his attorney, submitted his resignation to the County. At his deposition, Demers testified that he chose to resign because he was demoted and received a pay reduction. He also explained that while he was still permitted to work day shift, his days of work had been changed to the opposite days from his shift as a Jail Sergeant. Demers also testified he was worried about the Jail Sergeants on the shift he was assigned, because they "were very upset with me" and he did not know "how that was going to play out," specifically voicing concern about his personal safety should he need backup help on the job. (Demers Dep. (dkt. #25) 114, 119.) In March 2016, Demers took ownership of a business BL Medical Transport and began working for that business in April 2011.

### E. County's Review and Change of Jail Passdown Practice

In May 2016, HR Director Richie, in consultation with the County Corporation Counsel John Muench, arranged for the law firm of Weld Riley to conduct an investigation to determine "whether jail employees needed to be compensated for time spent during

passdown if the amount of time they worked exceeded their normal 12-hour shift." (Def.'s PFOFs (dkt. #21) ¶ 123.)[8] Sheriff Fitzgerald avers that: (1) he welcomed that investigation, (2) the outcome was not of concern; and (3) if back wages needed to be paid, he was not concerned because he believed the Department had sufficient reserve funds to make such payments.

After Weld Riley concluded that "jail staff should be paid for certain amounts of time spent engaging in shift change passdown procedures," Richie oversaw the process to determine which jail staff required payments and the amount of payments. (*Id.* ¶ 130.) Past payments were made to those employees, including Demers, in July 2016.

Sometime in 2016, a time clock was also installed where employees punched in and punched out. Employees were further directed how to round to seven-minutes. The change to the time clock system was made while Demers was still employed, though it appears that change was made between April 18 and May 7 while he was on FMLA leave. As part of this change, employees were paid for coming in 15 minutes early or staying 15 minutes late, including rounding time to seven minutes. For example, correctional officers would punch in at 6:15 to allow passdown, with their official shift start time remaining 6:30.

OPINION

## I. FLSA Retaliation

The FLSA makes it unlawful for an employer to "discharge or in any other manner

---

[8] Richie testified at her deposition that the delay between becoming aware of this issue in March 2016 and her contacting Weld Riley in May was due to vacation and being busy with other work.

discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). To demonstrate retaliation under the FLSA, plaintiff Demers must show: "(1) that he engaged in protected expression; (2) that he suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). Defendant Barron County challenges plaintiff's ability to prove both that he engage in protected conduct and causation.

## A. Protected Conduct

Defendant argues first that plaintiff's email to Jeff French, asking why jail staff were not paid for time spent engaged in passdown, is not protected conduct. While an employee's conduct need not mention FLSA to be protected, the Supreme Court requires the conduct "be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

In his March 9 email to County Administrator French, Demers asked a question about wages: whether the County Jail's practice of requiring staff to arrive 15 minutes before the start of their shift for passdown meant staff must be compensated for that time. Citing *Sloan v. American Brain Tumor Association*, 901 F.3d 891 (7th Cir. 2018), defendant argues this conduct alone is not protected as a matter of law. In *Sloan*, the Seventh Circuit affirmed the district court's finding that a plaintiff failed to demonstrate she engaged in

protected conduct under the FLSA in communications raising a "highly generalized protest" that a "'disciplinary action' was 'against federal law'." *Id.* at 894.

Here, Demers framed his email as a question, but its import was substantially more specific, or at least a reasonable factfinder could so find: Demers complained about the lack of pay for passdown time that jail sergeants and other officers were in his view required to spend on the job. Moreover, Demers directed his question to the County Administrator, who in turn sent it to HR, which in turn prompted HR to hire a law firm to conduct an investigation into whether the alleged practice violated wage and hours standards. This chain of events is perhaps the best evidence that plaintiff's email was sufficiently clear and detailed to notify the County of his concern about the lack of pay for the staff passdown period. Finally, although his concerns had been ignored when he went previously by the Jail's chain of command, Demers' complaint had substantial weight, as reflected in the County's change in policy and payment of backpay to affected employees, including Demers.

Relying on cases where a complaint to a co-worker was deemed insufficient to constitute protected conduct, defendant argues that Demers "did not send any email to a superior, rather only to his Sergeant peers." (Def.'s Opening Br. (dkt. #20) 7-8 (citing *Gries v. AKAL Sec., Inc.*, No. 06-CV-33-LRR, 2007 WL 2710034, at *25 (S.D. Iowa Aug. 27, 2007) ("[C]onfrontation of his co-worker cannot qualify as a FLSA "complaint" to AKAL."); *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) (discussing oral complaints and explaining that "a grumble in the hallway about an employer's payroll" does not constitute protected conduct under the FLSA)).) This argument, however, is

flawed for at least two reasons. *First*, Demers sent a written communication to the County Administrator, presumably someone who had authority to investigate pay violations; he was not simply airing his grievances with co-workers who had no authority to explain or investigate. *Second*, even assuming alerting County Administrator French to his concern is somehow insufficient to alert the County, after County Administrator French forwarded Demers' email to Evenson, Evenson and Demers then had an exchange about the County's failure to pay staff for the time spent before the start of a shift on passdown, and therefore Demers *did* send an email to a superior. Moreover, Demers testified at his deposition that he had complained about the lack of pay to two other supervisors during his employment.

While defendant had a valid basis for moving for summary judgment as to the *causation* element, defendant's motion as to the protected conduct element borders on frivolous, especially in light of defendant's misconstruing of the record, specifically failing to mention Demers' March 2016 email exchange with Evenson on the unpaid passdown time. Stretching for every possible basis for summary judgment diverts from arguments that may have more merit and wastes judicial resources.

## B. Causation

Defendant also challenges plaintiff's proof of causation, which traditionally has been proven by plaintiffs under the so-called direct or indirect method. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1975) (articulating burden-shifting framework sometimes referred to as the "indirect" method). Recognizing that the evidentiary distinctions in these methods have proven stilted and difficult to discern, the Seventh Circuit has more recently endorsed consideration of the evidence "as a whole, rather than

asking whether any particular piece of evidence proves the case by itself -- or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of the Chief Judge of Cook Cty.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). While the court has not extended this framework to FLSA retaliation claims specifically, the Seventh Circuit has repeatedly signaled that cases discussing retaliation claims under anti-discrimination statutes may be used to analyze FLSA retaliation claims. *See Kasten*, 703 F.3d at 973-76 (relying interchangeably on FLSA and anti-discrimination cases when addressing a FLSA retaliatory discharge claim); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 884 (7th Cir. 1996) (noting that the FLSA's retaliation provision is "parallel" to those of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Age Discrimination in Employment Act, 29 U.S.C. § 623(d)). Accordingly, the court will review plaintiff's evidence as a whole.

Before turning to plaintiff's evidence, the court must also address the parties' disagreement as to the specific causation requirement. Defendant maintains that plaintiff must demonstrate that he "would not have been demoted *but for* his protected activity." (Def.'s Opening Br. (dkt. #20) 8 (citing *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015) (setting forth "but for" or "because of" causation standard for Title VII retaliation claim); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) (holding that based on the language of the ADEA, a "plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action")).) Quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008), plaintiff, on the other hand, argues

that he needs only to show that "the protected conduct was a substantial or motivating factor in the employer's decision." (Pl.'s Opp'n (dkt. #43) 9.) However, *Gates* also concerns a Title VII retaliation claim, and more critically, the quoted language predates the United States Supreme Court's decision in *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013), holding that: (1) like *Gross*, the causation requirement turns on the specific language of the statute; and (2) since Title VII makes it unlawful to discriminate against an employee "because [the employee] has opposed" an unlawful employment practice, it also requires proof that the retaliation would not have occurred "but for" the protected activity. *Id.* at 352; *see also Greengrass*, 776 F.3d at 486.

While the Seventh Circuit has not addressed the specific standard applicable in *FLSA* retaliation claims, given the similarity of language between the retaliation provisions of the FLSA and Title VII, the court agrees with defendant that the "but for" or "because of" standard, rather than the motivating factor standard, governs plaintiff's claim. *See Poff v. Quick Pick, LLC*, No. 2:15-cv-00405-JMS-MJD, 2018 WL 6061569, at *4 (S.D. Ind. Nov. 20, 2018) (applying "but for" or "because of" standard to FLSA retaliation claim); *Head v. Prof'l Transp., Inc.*, No. No. 3:13–cv–00208–RLY–WGH, 2015 WL 5785797, at *4 (S.D. Ind. Sept. 30, 2015) (same).

The Seventh Circuit has instructed that "causation can be established by circumstantial evidence, which includes, for example, 'suspicious timing, a pretextual explanation for the [adverse action], and evidence that similarly situated employees were treated differently.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (citing *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016)). Here, plaintiff's evidence

falls into the initial, two categories: timing and pretext.

### 1. Timing

While "mere temporal proximity . . . will rarely be sufficient in and of itself to create a triable issue," *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002), the timing between the alleged protected conduct and Demers' demotion is particularly tight, with his March 9, 2016, email to County Administrator French inquiring about the County's failure to pay for passdown time occurring less than one month before the decision to demote Demers. Moreover, that email was followed by additional email exchanges with Jail Captain Evenson, with follow-up emails by Demers to his fellow Jail Sergeants, which Evenson either received second-hand or was able to review having been granted access to Demers' email account by the IT department.

### 2. Pretext

Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Bodenstab v. Cty. of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008)). "Pretext can be shown by 'identif[ying] . . . weaknesses, implausibilities, inconsistencies, or contradictions' in an employer's asserted reason for taking an adverse employment action such 'that a reasonable person could find [it] unworthy of credence." *Greengrass*, 776 F.3d at 487 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (alterations in original)).

As discussed in the fact section above, defendant offers various reasons for the decision to demote Demers, but whether viewed in the aggregate or individually Demers

has raised genuine issues of material fact to permit a reasonable jury to find these reasons pretextual. Indeed, plaintiff's opposition brief on summary judgment points out that the various reasons defendant offered for Demers' demotion lack any real support in the record.

### a. Communication Concerns

*First*, defendant maintains that Demers was demoted because of his inability to communicate generally, and his failure to communicate with Captain Evenson in particular. In its reply brief, however, defendant does not even acknowledge, much less account for, Demers March 20 email, which both describes his concern about the lack of payment for passdown time *and* proposes a method for satisfying the Policy and Procedure Manual requirement of passdown without requiring staff to work without pay. In response, Evenson's March 22 email failed to provide *any* solution for the issue defined by Demers, or at least a reasonable jury could so find. Instead, Evenson instructed Demers and the other Jail Sergeants that officers must conduct passdown *and* be at their assigned post at the start of the shift. In light of the Policy and Procedure Manual's definition of "shift briefing" as a "gathering of an on-coming shift and a shift supervisor for the relay of pertinent information, special assignments or activities that need to be performed on an upcoming shift" (Hanson Decl., Ex. 11 (dkt. #33-11) 1), Evenson's email provided *no* guidance on how to accomplish passdown without requiring staff to report to duty before their official shift start time.

Perhaps in recognition that his suggested "temporary" solution was not a solution at all, Captain Evenson's email then also stated that arriving early "on your own" (e.g.,

without being required) was "appreciated," which a reasonable factfinder could conclude was a "wink-wink" requirement to maintain the practice of reporting before shift and working for approximately 15 minutes without pay. Regardless, Demers' follow-up March 29 email to his fellow Jail Sergeants was entirely consistent with his March 10 email to Evenson proposing his original plan. Therefore, a reasonable jury *could* find defendant's contention that Demers' failed to communicate with Evenson about this issue belied by the record itself.

Alternatively, defendant frames Demers' emails with his colleagues as an act of insubordination. Even plaintiff acknowledges that his plan was contrary to Evenson's requirement that all staff be at their post by the start of the shift. Viewed that way, a reasonable jury could find that this constituted insubordination and find this act a legitimate reason for Demers' demotion. On the other hand, a reasonable jury *could* conclude that Demers' March 29th plan was not insubordinate because Evenson had also directed his staff to follow policy, which Demers represents was his intent in circulating his proposed plan to his fellow Jail Sergeants. While Captain Evenson also characterized Demers' March 29th email to his colleagues as "giving his fellow sergeants directives" (Hanson Decl., Ex. 17 (dkt. #33-17) 2), this characterization is not necessarily supported by the plain language of the email, in which Demers simply informed his colleagues of his passdown plan, but did not require, nor even suggest, that they adopt his same plan. Indeed, if other Jail Sergeants and correctional officers wanted to continue to arrive early for passdown, this would not affect Demers plan for jail officers assigned to his shift taking a different approach along with him.

To the extent, the County's alleged concerns about Demers' communication abilities implicates his March 9 email to County Administrator French -- specifically, a concern that Demers' failed to follow the chain of command in raising this issue -- this, too, raises another issue of fact for the jury, who will have to decide whether the email is viewed as a legitimate exercise of his rights under the FLSA or an act of insubordination by jumping the chain of command. *See Walters v. Mayo Clinic Health Sys.--Eau Claire Hosp., Inc.*, 91 F. Supp. 3d 1071, 1078 (W.D. Wis. 2015) (explaining that whether employer could isolate attendance issues and terminate an attorney seeking FMLA leave on that basis was a question for the jury).[9]

### b. Past Performance

*Second*, defendant maintains Demers was demoted because of "past performance" issues that supposedly dated back to 2012. As described in detail in the record above, however, Demers' disciplinary record appears limited to the following events: (1) a verbal reprimand in 2012 about abuse of sick leave; (2) counseling in 2012 about the tone of internal staff emails;[10] (3) a written reprimand (or letter of discipline) in 2013 about harassing his brother-in-law; (4) a February 2016 counseling session / discussion about the

---

[9] In addition to evidence of pretext, plaintiff puts forth evidence of Sheriff Fitzgerald's statements during the demotion discussion, in which he allegedly said that Demers "wasn't a team player" and that he "couldn't have people bucking the system." (Demers Decl. (dkt. #42) ¶ 5 (internal citations omitted).) These statements could also give rise to a reasonable inference that Fitzgerald was actually complaining about Demers' raising a concern on passdown pay with the County Administrator.

[10] The County's exhibits repeatedly reference that Demers was going through a divorce in 2012, causing significant stress, which the County relied on to account, at least in part, for these so-called "disciplinary actions."

perception of a "negative atmosphere" on his shift; and (5) a March 10, 2016, written reprimand regarding body cameras. With the exception of the March 2016 written reprimand, these other matters date back to 2012 and 2013. Although they might not, a reasonable jury could find that defendant's reliance on these "past performance" issues as grounds to demote Demers as pretext.

As such, the facts here are distinguishable from the facts at issue in *Debs v. Northeastern Illinois University*, 153 F.3d 390 (7th Cir. 1998), a case on which defendant relies. In *Debs*, the Seventh Circuit affirmed the district court's grant of summary judgment to the employer defendant because the plaintiff had failed to rebut the defendant's evidence of a legitimate basis for the plaintiff's termination. In that case, however, the undisputed evidence demonstrated that the plaintiff was "the subject of significant and substantial employee grievances," and the defendant "acted on the recommendations of an independent investigator" in terminating him. *Id.* at 396. Demers' disciplinary history is in no way comparable to that considered in *Debs*.[11]

Defendant's characterization of Demers' disciplinary history in Evenson's April 5, 2016, internal memo, and the Last Chance Agreement could further support a reasonable jury finding Demers' disciplinary history as an illegitimate basis for his demotion. As described above, Evenson himself describes in an August 5, 2016, document that he had

---

[11] Defendants also relies on *Owens v. Old Wisconsin Sausage Company, Inc.*, 870 F.3d 662, 669 (7th Cir. 2017), in which the court affirmed summary judgment to defendant on plaintiff's FLSA retaliation claim where plaintiff disavowed a causal link between her termination and any FLSA complaint by "repeatedly and consistently, in this court and in the district court, argu[ing] that the reason for her termination was her failure to answer the questions posed to her regarding her relationship with [a job applicant she had terminated]."

"received information that Demers had directed his staff not to wear the required body cameras as directed in policy," which he later acknowledged was not accurate, having only heard that Demers and his staff were not wearing the body cameras consistently, not that he had directed them not to wear them. (Hanson Decl., Ex. 17 (dkt. #33-17) 3; Evenson Dep. (dkt. #27) 62-63 (acknowledging that the person complaining did say that "Demers told his staff not to use them at all," rather she reported "they were not using them").)

In addition to repeating the same mischaracterization of the body camera disciplinary action -- "Demers' *directing* his crew to go against department policy and not wear body cameras" -- the Last Chance Agreement also identifies certain incidents as "verbal warnings," even though the contemporaneous notes from those incidents do not identify that Demers actually received a verbal warning. (*Compare* Hanson Decl., Ex. 20 (dkt. #33-20) (noting September 26, 20[1]2 "verbal warning" from Baures about "undermining decisions and treating other Sergeants in unprofessional manner"), *with* Baures Dep. (dkt. #24) 13 (discussing general concerns about emails and conversation with others about Demers being unhappy with Baures, but not recounting a verbal reprimand); Hanson Decl., Ex. 20 (dkt. #33-20) (noting Jan. 13, 2016 "verbal warning" related to citizen complaint), *with* Hanson Decl., Ex. 33 (dkt. #33-35) (email exchange regarding citizen complaint, but no record of verbal warning); Hanson Decl., Ex. 20 (dkt. #33-20) (describing February 29, 2016, "verbal warning" about importance of communication), *with* Hanson Decl., Ex. 7 (dkt. #33-7) (recounting meeting with Demers but not indicating that he received a "verbal warning").) As described above, to the extent these incidents involved "counseling" instead of an actual verbal warning, counseling is not

a form of discipline under the Sheriff's Department Policy and Procedures Manual. (Hanson Decl., Ex. 31 (dkt. #33-31) 42.)

Drawing all inferences in plaintiff's favor, therefore, a reasonable jury could find that the County "padded" Demers' disciplinary history to justify his demotion. Such a finding would be further supported by Demers' actual 2014 and 2015 performance evaluations, neither of which indicate any concerns about communication, insubordination or related issues. At minimum, these evaluations call into question HR Administrator Richie's testimony that Demers' performance reviews were consistent with Evenson's account of Demers' performance problems to justify his demotion.

### c. Body Camera

*Third*, Sheriff Fitzgerald testified at his deposition that Demers was actually demoted because of the body camera issue. (Fitzgerald Dep. (dkt. #28) 17.) Moreover, at his deposition, County Administrator French testified that Fitzgerald had told him Demers was being demoted because of the lack of use of body cameras, as well as Demers' disregard of the body camera policy. (French Dep. (dkt. #29) 20-21.) Having already received a written reprimand for the body camera incident, a reasonable jury could find that it was an unlikely explanation for the subsequent decision to demote Demers, especially when some of his staff did wear body cameras contrary to the assertion that Demers had directed them not to do so. In other words, viewing the body camera incident alone, a jury could reasonably conclude that an additional, intervening event would be required to justify the County demoting Demers after agreeing to issue a written reprimand immediately following the incident.

As for each of these three justifications, therefore, plaintiff has put forth sufficient evidence from which a reasonable factfinder could conclude that he was demoted because of his complaint about being required to arrive early for shift passdown without compensation.[12]

## II. Constructive Discharge

Because the Seventh Circuit has established a much more daunting, objective standard before a plaintiff may proceed on a constructive discharge claim, defendant's motion for summary judgment on that claim has merit.[13] Constructive discharge "occurs when the plaintiff shows that he was *forced* to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (emphasis added) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). The Seventh Circuit "has recognized two different forms of constructive discharge," although "neither dispenses with the requirement that the work environment had become intolerable." *Chapin*, 621 F.3d at 679 (citing *Pa. State Police,* 542 U.S. at 141). Plaintiff maintains that both forms of constructive discharge apply here.

---

[12] Plaintiff also argues that the "cat's paw" theory is applicable in the case, in response to a possible argument that Fitzgerald as the decisionmaker "should not be charged with Evenson's bias." (Pl.'s Opp'n (dkt. #43) 19-20.) *See generally Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). Plaintiff, however, did not make this argument, perhaps because there is no dispute that Fitzgerald was aware of Demers' communications with French and others about not being paid for passdown time. The court, however, would entertain a "cat's paw" jury instruction if it becomes material.

[13] There is no dispute that Demers suffered an adverse employment action in the form of a demotion, his claim that he was also constructively discharged is not necessary to state a claim for retaliation under the FLSA. Thus, Demers' constructive discharge claim would be largely relevant to expanding Demers' damages case to include termination of employment.

The *first* form requires "a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin*, 621 F.3d at 679 (internal citations omitted). Cases in which the Seventh Circuit has recognized this form of constructive discharge typically involve overt threats by the employer to one's physical safety. *See id.* (citing cases).

Lacking evidence of any such threats, Demers suggests his subjective concerns about physical safety may be enough. In particular, plaintiff speculates that after being demoted, his fellow jail officers may not have his back. Without in any way discounting that plaintiff may have had those concerns, he points to no evidence for this belief -- for example, statements by subordinate correctional officers or his fellow jail sergeants that they would no longer defend (or were directed not to defend) him on the job. *See, e.g.*, *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (explaining claim for constructive discharge possible where harassment included repeated use of noose and implied threats of physical violence); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198–99 (7th Cir. 1992) (affirming district court's finding of constructive discharge where supervisor brandished a firearm and held it to the plaintiff's head).

On the contrary, immediately after his demotion, Demers took FMLA leave, never returning to employment. As a result, he can point to no incidents or statements before or after his demotion to support his subjective concern about possible threats to his safety, combined with Demers' own acknowledgement during his deposition that it is the *duty* of

34

Jail Sergeants and Jail Officers to come to the aid of one another if there were an incident. (Demers' Dep. (dkt. #25) 119).) This is not to suggest an objectively reasonable fear that coworkers would no longer support an employee may not constitute a basis to claim constructive discharge, particularly on a job like a correctional or police officer when backup may be a matter of life or death. Rather, the court finds an absence of required, corroborating evidence that would support a jury's finding that plaintiff had such an objectively reasonable fear here. Plaintiff has simply fallen short of proof that his fellow officers would violate that duty because he raised an ultimately meritorious concern about their not being compensated for work performed. Finally, while recognizing that Demers claimed that the demotion decision caused him to be depressed, requiring FMLA leave, the court concludes that a reasonable jury could not find that his work as a jail officer was so unbearable as to force his resignation on the limited evidence offered by Demers. *See Chapin*, 621 F.3d at 679.

The *second* form of constructive discharge "occurs '[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated.'" *Chapin*, 6121 F.3d at 679 (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)). In his brief in opposition, plaintiff asserts that "Demers was told that the ax was about to drop and/or that he did not have a future." (Pl.'s Opp'n (dkt. #43) 22.) However, plaintiff provides *no* evidentiary support for this statement. To the contrary, while the Last Chance Agreement advised Demers that this was "his last chance to remain employed," there is no evidence that Demers would be terminated absent additional conduct the Department deemed inappropriate or contrary to policy. Indeed, even where

an employer has given an employee "notice of [its] intent to commence a process that could lead to her discharge and "the employer [did] not undermine the employee's position, prerequisites or dignity in the interim," the Seventh Circuit has held that no reasonable jury could find constructive discharge. *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 528 (7th Cir. 2015) (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)). Here, with the County's HR Director involved in the process of demoting him -- and the ultimate determination by an outside firm that Demers had raised a legitimate wage and hour concern -- it is at least open to question whether Demers' demotion and Last Chance Agreement would have *inevitably* led to his discharge. "Simply put, 'the prospect of being fired at the conclusion of an extended process is not itself a constructive discharge.'" *Wright*, 798 F.3d at 530 (quoting *Cigan*, 798 at 334). "[T]o hold otherwise 'would take us a long distance indeed from 'unendurable working conditions' and require courts to engage in speculation." *Id*. at 529 (quoting *Cigan*, 798 at 333); *see also Cigan,* 388 F.3d at 333-334 ("The only way to know how matters will turn out is to let the process run its course. Litigation to determine what would have happened, had the employee contested the recommendation, is a poor substitute for the actual results of real deliberation within the employer's hierarchy.").

To the extent Demers is relying on Sheriff Fitzgerald's alleged angry reaction during the demotion meeting -- allegedly raising his voice and slamming his fists on a desk -- the Seventh Circuit is clear that "[o]ne threat and raised voices would not rise to the level of a hostile work environment, and so it also cannot be the basis for . . . [a] constructive discharge claim." *Chapin*, 621 F.3d at 679 (citing *Tutman v. WBBM–TV, Inc./CBS, Inc.*,

209 F.3d 1044, 1050 (7th Cir. 2000)).

As in *Chapin,* therefore, the court agrees that there is "nothing to indicate that a firing here was an imminent and inevitable event." 621 F.3d at 680; *see also Univ. of Chi. Hosps.*, 276 F.3d at 332 (reversing grant of summary judgment in defendant's favor on constructive discharge claim based on evidence that when employee "arrived at work, her belongings were packed and her office was being used for storage"). In other words, plaintiff has failed to come forward with evidence to support his claim that an objectively reasonable employee would have viewed termination as inevitable. *See Wright,* 798 F.3d at 528 (Plaintiff's constructive discharge claim turned on "[w]hether a reasonable person would believe that her employer had *acted in a manner that communicated* that the employee would be terminated imminently, not simply whether the employee reasonably thought she would be terminated."). As such, the court will grant this portion of the motion, entering summary judgment in defendant's favor on plaintiff's claim.

## ORDER

IT IS ORDERED that defendant Barron County's motion for summary judgment (dkt. #19) is GRANTED IN PART AND DENIED IN PART. The motion is granted as to the constructive discharge claim, but denied in all other respects.

Entered this 29th day of May, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

37